Thomas R. Curtin
Joseph P. LaSala
George C. Jones
MCELROY, DEUTSCH, MULVANEY
 & CARPENTER, LLP
1300 Mount Kemble Avenue
P.O. Box 2075
Morristown, New Jersey 07962-2075
(973) 993-8100

*Attorneys for Plaintiff WinView Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| WINVIEW INC., a Delaware corporation,<br><br>        Plaintiff,<br><br>    v.<br><br>DRAFTKINGS INC., a Nevada corporation,<br>DRAFTKINGS INC., a Delaware corporation,<br>and CROWN GAMING INC., a Delaware<br>corporation,<br><br>        Defendants. | Civil Action No.  21-13405 (ZNQ) (DEA)<br><br><br>**SECOND AMENDED COMPLAINT<br>FOR PATENT INFRINGEMENT**<br><br>**DEMAND FOR JURY TRIAL** |

## WINVIEW INC.'S SECOND AMENDED COMPLAINT
## FOR PATENT INFRINGEMENT

Pursuant to Local Civil Rule 10.1, the address of Plaintiff WinView Inc. ("WinView") is

50 Woodside Plaza, Suite 208, Redwood City, California 94061. The address of Defendants

DraftKings Inc., a Nevada corporation ("DraftKings NV"), DraftKings Inc., a Delaware

corporation ("DraftKings DE"), and Crown Gaming Inc., a Delaware corporation ("Crown

- 1 -

Gaming") in New Jersey is 111 River Street, Hoboken, New Jersey 07030, and at additional locations in New Jersey as set forth herein.  Hereinafter, DraftKings NV, DraftKings DE, and Crown Gaming will be collectively referred to as "Defendants" or "DraftKings".  WinView, by and through its undersigned counsel, complains against DraftKings and alleges as follows:

## NATURE OF THIS ACTION

1.    This is an action for patent infringement arising under 28 U.S.C. § 1331 and the United States Patent Act, 35 U.S.C. § 100 *et seq*.  WinView seeks damages and other appropriate relief from Defendants for DraftKings' infringement of the asserted WinView patents by DraftKings' Sportsbook and Daily Fantasy Sports offerings and related mobile applications.

## THE PARTIES

2.    Plaintiff WinView is a corporation duly organized and existing under the laws of the State of Delaware.  WinView is located at 50 Woodside Plaza, Suite 208, Redwood City, California 94061.  WinView is a wholly-owned subsidiary of Engine Media Holdings, Inc. (Nasdaq: GAME), a corporation organized and existing under the laws of British Columbia, Canada, headquartered at 77 King Street West, Suite 3000, Toronto, Ontario M5K 1G8 Canada.

3.    WinView is a pioneer in interactive television and mobile gaming.  WinView's technologies enable the creation of an environment that makes the sports viewing and gaming experience more fair, engaging, and exciting.  Sports fans in New Jersey and across the country can watch sports on television, enter contests, and compete against other fans—winning cash or prizes as the action unfolds.  WinView's innovations have resulted in an extensive portfolio of United States patents, including U.S. Patent Nos. 9,878,243; 9,993,730; 10,721,543; and 10,806,988 (collectively, the "Asserted Patents").  WinView is the owner by assignment of all right, title, and interest to the Asserted Patents.

4. DraftKings is a digital sports entertainment and gaming company. DraftKings provides users with daily fantasy sports ("Daily Fantasy" or "Daily Fantasy Sports") and sports betting ("Sportsbook") opportunities, among other offerings. DraftKings also is involved in the design, development, and licensing of sports betting and casino gaming software for online and retail sportsbook and casino gaming products. For example, DraftKings offers the DraftKings Sportsbook online at https://sportsbook.draftkings.com and a DraftKings Sportsbook application for mobile devices. DraftKings also offers Daily Fantasy Sports online at https://www.draftkings.com and a DraftKings Daily Fantasy Sports application for mobile devices. DraftKings has provided and continues to provide websites and related software, products, and services that practice the Asserted Patents without authorization from WinView. On information and belief, DraftKings operates through a number of related corporate entities, including DraftKings NV, DraftKings DE, and Crown Gaming, which are also alter egos of one another, such that DraftKings operates as a consolidated and joint enterprise, and the acts of one defendant are attributable to the others for purposes of the matters alleged herein.

5. On information and belief, DraftKings NV is a corporation duly organized and existing under the laws of the State of Nevada having executive offices at 222 Berkeley Street, Boston, Massachusetts 02116, and having regular and established places of business at 221 River Street, Hoboken, New Jersey 07030; 111 River Street, Hoboken, New Jersey 07030; and 1133 Boardwalk, Atlantic City, New Jersey 08401.

6. DraftKings NV is a publicly traded company. Beginning April 24, 2020, the shares of Class A common stock in the company traded on the NASDAQ stock exchange under the ticker symbol "DKNG" and continue to be traded publicly under this stock symbol. DraftKings NV's public securities filings, including the 10-K Annual Report for the year ended December 31, 2020,

describe the activities and business of DraftKings NV and informed the public that in the DraftKings' securities filings the terms "DraftKings," "'we', 'our,' and 'us' and similar terms refer to DraftKings Inc., a Nevada corporation."

7.     On information and belief, DraftKings DE is a corporation duly organized and existing under the laws of the State of Delaware, having executive offices at 222 Berkeley Street, Boston, Massachusetts 02116, and having regular and established places of business at 221 River Street, Hoboken, New Jersey 07030; 111 River Street, Hoboken, New Jersey 07030; and 1133 Boardwalk, Atlantic City, New Jersey 08401. On information and belief, DraftKings DE is a wholly-owned subsidiary of DraftKings NV.

8.     On information and belief, Crown Gaming is a corporation duly organized and existing under the laws of the State of Delaware, having executive offices at 222 Berkeley Street, Boston, Massachusetts 02116, and having regular and established places of business at 221 River Street, Hoboken, New Jersey 07030; 111 River Street, Hoboken, New Jersey 07030; and 1133 Boardwalk, Atlantic City, New Jersey 08401.  On information and belief, Crown Gaming is a wholly-owned subsidiary of DraftKings DE, and a parent of Crown NJ Gaming, Inc. ("Crown NJ Gaming"). Crown NJ Gaming is a corporation existing under the laws of the State of Delaware, and having regular and established places of business at 221 River Street, Hoboken, New Jersey 07030; 111 River Street, Hoboken, New Jersey 07030; and/or 1133 Boardwalk, Atlantic City, New Jersey 08401.

9.     On information and belief, DraftKings NV, DraftKings DE, Crown Gaming, and Crown NJ Gaming operate and do business under the names "DraftKings" and "DraftKings Sportsbook at Resorts Casino."  On information and belief, DraftKings DE provides Sportsbook and Daily Fantasy Sports services solely for DraftKings offerings. On information and belief,

Crown Gaming provides sports betting services solely for DraftKings offerings. Specifically, on information and belief, Crown Gaming operates sports and other betting games for DraftKings, through electronic, interactive, and technological means (including the internet).

10.     On information and belief, Crown Gaming holds New Jersey licenses on behalf of DraftKings via Crown NJ Gaming. On information and belief, DraftKings NV, DraftKings DE, and Crown Gaming control and dominate Crown NJ Gaming (and other entities that hold licensing registrations in states where DraftKings' gambling operations have been legalized, like "Crown NY Gaming Inc." and "Crown PA Gaming Inc.").  On information and belief, Crown Gaming and Crown NJ Gaming share directors, officers, and facilities. On information and belief, Crown NJ Gaming is a mere alter ego, agent, and/or instrumentality of Crown Gaming, and in turn DraftKings DE and DraftKings NV. Crown NJ Gaming, in tandem with and under the control and direction of DraftKings NV, DraftKings DE, and Crown Gaming, operates a retail location called the DraftKings Sportsbook at Resorts Casino, located at 1133 Boardwalk, Atlantic City, New Jersey 08401.

11.     On information and belief, Defendants DraftKings NV, DraftKings DE, and Crown Gaming share corporate offices and operate out of the same facilities, having regular and established places of business at least in New Jersey and Massachusetts at 221 River Street, Hoboken, New Jersey 07030; 111 River Street, Hoboken, New Jersey 07030; 1133 Boardwalk, Atlantic City, New Jersey 08401; and 222 Berkeley Street, Boston, Massachusetts 02116.

12.     DraftKings' website states that "In Hoboken, our Sportsbook and Customer Service teams are emphasized."

13.     On information and belief, the same individuals hold positions as officers and directors of DraftKings NV, DraftKings DE, and Crown Gaming.  For example:

a.      On information and belief, Mr. Paul Liberman is a co-founder and director of DraftKings and is the President of Global Technology and Product of DraftKings NV and DraftKings DE.  DraftKings describes Mr. Liberman as "instrumental" in leading the development of the DraftKings Daily Fantasy Sports application and the DraftKings Sportsbook platform. On information and belief, Mr. Liberman is also a director and president of Crown Gaming and a director of Crown NJ Gaming.

b.      On information and belief, Timothy Dent is the Chief Compliance Officer of DraftKings NV and has been the Chief Financial Officer of DraftKings DE. On information and belief, Mr. Dent is also a director of Crown Gaming and has been Treasurer and Chief Financial Officer of Crown Gaming. Mr. Dent is also a director and treasurer of Crown NJ Gaming.

c.      On information and belief, R. Stanton Dodge is the Chief Legal Officer and Secretary for DraftKings NV and DraftKings DE and the Chief Legal Officer of Crown Gaming.

d.      On information and belief, Jason Robins, Matthew Kalish, Marni Walden, Hany Nada, Woodrow Levin, Steven Murray, John Salter, and Ryan Moore each serve as directors for both DraftKings NV and DraftKings DE.

14.    DraftKings markets, advertises, sells, and offers to sell the DraftKings Sportsbook and DraftKings Daily Fantasy Sports products, services and mobile applications through its root website domain draftkings.com, which includes the subdomains www.draftkings.com and sportsbook.draftkings.com. The website and mobile applications prominently use the names "DraftKings," "DraftKings Sportsbook," and "DraftKings Daily Fantasy Sports" throughout.  On information and belief, the DraftKings Sportsbook and Daily Fantasy Sports websites and mobile

applications are effectuated at least in part through, and attributable to, DraftKings NV, DraftKings DE, and Crown Gaming.

15.     The DraftKings website includes copyright notices identifying "DraftKings" as the owner and are thus attributed to at least DraftKings NV, DraftKings DE, and Crown Gaming, all of which do business under the name "DraftKings."  In providing information regarding the website and DraftKings, the website identifies "DraftKings Inc. Boston, MA."  On information and belief, the DraftKings website is administered and operated by, DraftKings NV in conjunction with DraftKings DE, a wholly-owned subsidiary of the same name, along with Crown Gaming which also does business as DraftKings.  DraftKings' website also lists a "US Office" at 222 Berkeley Street, Boston, MA 02116, a "New Jersey Office" with a mailing address at PO Box 399, Hoboken, NJ 07030, and a UK office location.  On information and belief, to comply with state laws, DraftKings tracks and validates the location of users to ensure that they are within certain states, including New Jersey, where the DraftKings offerings they seek to use are permitted.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a) because this action arises under the patent laws of the United States, Title 35 United States Code, including 35 U.S.C. § 1 *et seq*.  This complaint includes claims for patent infringement arising under the patent laws of the United States, including 35 U.S.C. § 271, *et seq.*

17.     This Court has personal jurisdiction over DraftKings NV, DraftKings DE, and Crown Gaming because, on information and belief, they have availed themselves of the legal protections of the State of New Jersey by, among other things, maintaining a physical presence and regular places of business in New Jersey, conducting business in the State of New Jersey, and engaging in continuous and systematic activities in the District of New Jersey.  This Court also

has personal jurisdiction over DraftKings NV, DraftKings DE, and Crown Gaming, because they make, use, offer for sale, and/or sell products and services in the District of New Jersey and have committed and continue to commit acts of infringement in the District of New Jersey. On information and belief, they derive substantial revenue from the acts of infringement in the District of New Jersey and derive substantial revenue from interstate and international commerce associated with the infringing products.

18.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b) and (c) and 35 U.S.C. § 1400(b) at least because DraftKings NV, DraftKings DE, and Crown Gaming have committed acts of infringement within this judicial district giving rise to this action and have regular and established places of business in this judicial district, including offices located at 221 River Street, Hoboken, New Jersey 07030; 111 River Street, Hoboken, New Jersey 07030; and/or 1133 Boardwalk, Atlantic City, New Jersey 08401. On information and belief, at least the DraftKings Sportsbook team is emphasized in the Hoboken location.

19.     Defendants are properly joined under 35 U.S.C. § 299(a) because, as set forth in greater detail herein, Plaintiff's right to relief is asserted herein against Defendants jointly, severally, and in the alternative with respect to or arising out of the same transactions, occurrences, and series of transactions and occurrences relating to the making, using, selling, and/or offering to sell into the United States the same accused products and services, and questions of fact common to all defendants will arise in the action. Defendants, through their own acts and/or each through the acts of each other acting as its representative, alter ego, or agent, of each other, commonly and/or jointly make, use, sell, and/or offer for sale the same infringing products and services, including the DraftKings Sportsbook and DraftKings Daily Fantasy Sports offerings through the DraftKings website.

## FACTUAL BACKGROUND

**A.**     **The '243 and '730 Patents**

20.     On January 30, 2018, the United States Patent and Trademark Office ("USPTO") duly and legally issued United States Patent No. 9,878,243 (the "'243 Patent") entitled "Methodology for Equalizing Systemic Latencies in Television Reception in Connection with Games of Skill Played in Connection with Live Television Programming" to inventors David B. Lockton, Mark K. Berner, Mark J. Micheli, and David Lowe.  The '243 Patent has 23 claims. WinView is the owner by assignment of the entire right, title, and interest in and to the '243 Patent, including the right to seek damages and any remedies for past, current, and future infringement thereof.  A true and correct copy of the '243 Patent is attached to this Complaint as Exhibit 1.

21.     On June 12, 2018, the United States Patent and Trademark Office ("USPTO") duly and legally issued United States Patent No. 9,993,730 (the "'730 Patent") entitled "Methodology for Equalizing Systemic Latencies in Television Reception in Connection with Games of Skill Played in Connection with Live Television Programming" to inventors David B. Lockton, Mark K. Berner, Mark J. Micheli, and David Lowe.  The '730 Patent has 81 claims.  WinView is the owner by assignment of the entire right, title, and interest in and to the '730 Patent, including the right to seek damages and any remedies for past, current, and future infringement thereof.  A true and correct copy of the '730 Patent is attached to this Complaint as Exhibit 2.

22.     The '243 and '730 Patents claim priority to United States Patent Application No. 11/786,992 filed on April 12, 2007 (now U.S. Patent No. 8,149,530) and United States Provisional Application No. 60/791,793 filed on April 12, 2006.

23.     The inventions claimed in the '243 and '730 Patents relate to specific improvements in computer technologies related to distributed gaming and distributed gaming utilizing a mobile device.

24.     Games of skill and chance, such as sports betting or contests played in conjunction with live sporting events, have an intrinsic excitement and entertainment value.  The inventors recognized and solved problems associated with the fact that television signal reception is not synchronized nationwide.  For example, users who wish to participate in a game of skill or chance relating to a sporting event on television may receive their information about the underlying sporting events through different means and at different times.  For example, one person may receive their television content over cable television, another may be watching on satellite television, and another may be receiving content online.  An individual in New Jersey using a satellite dish network may, for example, experience a three-second delay compared to an individual in California using a cable network. Recognizing that these latencies in receipt of broadcast content need to be accommodated in order to maintain user enjoyment and fairness for all participants, the inventors described and claimed technical solutions to these problems.

25.     The claims of the '243 and '730 Patents recite new and unconventional methods for conducting games of skill or chance in a distributed environment.  The claims are necessarily rooted in computer technologies and provide technical solutions to overcome the problems associated with participants in games of skill or chance on mobile devices experiencing different latencies in their receipt of television content.

26.     Claim 1 of the '243 Patent recites:

> 1. A method of equalizing effects of latency differences in a game of skill or chance or other entertainment comprising:
>
> > a. receiving an online broadcast of content;

- 10 -

b. synchronizing the game of skill or chance or other entertainment with the online broadcast of content; and

c. presenting the online broadcast of content and synchronized game data.

27.    Claim 1 of the '730 Patent recites:

1. A game server comprising:

a. a memory for storing an application for conducting a game of skill or chance, the application configured for:

i. communicating with a plurality of Internet-connected devices grouped into a cohort; and

ii. sending a lockout signal at an appropriate time based on an amount of delay to prevent users from submitting a response to a game of skill or chance or other entertainment; and

b. a processor for processing the application.

28.    Claim 7 of the '730 Patent recites:  "The game server as claimed in claim 1 wherein the amount of delay accounts for delays within a television signal reception path."

29.    Claim 8 of the '730 Patent recites:  "The game server of claim 1 wherein the game of skill or chance or other entertainment is synchronized with a broadcast."

30.    The '243 and '730 Patents are valid and enforceable.

**B.    The '543 Patent**

31.    On July 21, 2020, the USPTO duly and legally issued United States Patent No. 10,721,543 (the "'543 Patent") entitled "Method Of and System For Managing Client Resources and Assets for Activities On Computing Devices" to inventors Tim Huske, Mark J. Micheli, Mark K. Berner, Matt Ford, and David B. Lockton.  The '543 Patent has 141 claims.  WinView is the owner by assignment of the entire right, title, and interest in and to the '543 Patent, including the right to seek damages and any remedies for past, current, and future infringement thereof.  A true and correct copy of the '543 Patent is attached to this Complaint as Exhibit 3.

- 11 -

32.     The '543 Patent claims priority to United States Patent Application No. 11/472,241 filed on June 20, 2006 (now U.S. Patent No. 8,738,694) and United States Provisional Application No. 60/692,356 filed on June 20, 2005.

33.     The inventions claimed in the '543 Patent relate to specific improvements in computer technologies related to distributed entertainment services with respect to events or programs occurring in various geographic locations.

34.     The '543 Patent teaches, among other things, the use of an "activity client" installed on a user's device that manages the game data presented to a user based on the geographic location of the device.  For example, different states have different regulations relating to games of skill or chance.  As set out in the specification:

> When games of skill are offered, each state's laws will define what constitutes a legal game of skill. The same game playable for prizes by a user at one location is not necessarily legal for a user across a state line which might be across the street. It is incumbent upon the entertainment service operator to abide by the laws in each of the jurisdictions where it has users.

Ex. 3 at 5:63-6:2.  Determining the location of the mobile device allows the system to take into account different state laws that limit the games of skill or chance that may be available or lawful in a particular location.  Monitoring the location of the device also allows the service provider to display different information to the user based on their location, including preventing use of the system if a mobile device is present in, or moves to, a location where the activity is not permitted.

35.     The inventors also recognized the need to overcome problems unique to entertainment services in a distributed environment with numerous users and a large amount of content, including the need to economize the resources needed for the large amount of data that may need to be provided to users.  By providing only assets that are not already resident on a mobile web-connected computing device instead of entire data packages, the patented approaches

also allow a user's computing device to operate more efficiently. The patented approach also reduces the amount of memory that is required.

36.     Claim 1 of the '543 Patent recites:

1. A method of implementing a consumer service on a mobile web-connected computing device comprising:

loading a set of service related information located on a server related to a geographic location of the mobile web-connected computing device to an activity client, wherein the geographic location of the mobile web-connected computing device determines the set of service related information to be loaded from the server, wherein the set of service related information includes service related information relative to the geographic location of the mobile web-connected computing device, and further wherein as the geographic location of the mobile web-connected computing device changes, different service related information is presented through the activity client based on the geographic location;

selecting an option from the activity client from a list of available options;

downloading a set of service-specific information related to a selected option from a server to the mobile web-connected computing device; and

executing an application related to the selected option within the activity client on the mobile web-connected computing device.

37.     Claim 9 of the '543 Patent recites:  "The method of claim 1 further comprising identifying a user status including identifying a current geographic location of the mobile web-connected computing device."

38.     The '543 Patent is valid and enforceable.

**C.     The '988 Patent**

39.     On October 20, 2020, the USPTO duly and legally issued United States Patent No. 10,806,988 (the "'988 Patent") entitled "Method Of and System For Conducting Multiple Contests of Skill with a Single Performance" to inventor David B. Lockton.  The '988 Patent has 97 claims. WinView is the owner by assignment of the entire right, title, and interest in and to the '988 Patent,

including the right to seek damages and any remedies for past, current, and future infringement thereof.  A true and correct copy of the '988 Patent is attached to this Complaint as Exhibit 4.

40.     The '988 Patent claims priority to United States Patent Application No. 11/652,240 filed on January 10, 2007 (now U.S. Patent No. 8,002,618) and United States Provisional Application No. 60/757,960 filed on January 10, 2006.

41.     The inventions claimed in the '988 Patent relate to specific improvements in computer technologies related to distributed gaming and distributed gaming utilizing a mobile device.

42.     Games of skill and chance, such as daily fantasy sports contests, have an intrinsic excitement and entertainment value.  The inventors of the '988 Patent recognized that the excitement and entertainment value of participating in games of skill and chance can be greatly enhanced by a participant's ability to compete against multiple groups of competitors simultaneously based on a single performance of the participant.  The inventors further recognized the benefits from allowing participants to know how their performance compares in relation to the other participants against whom they are competing, and that competition among multiple groups of competitors offers the opportunity of increased enjoyment and prizes.

43.     The '988 Patent describes methods and systems for conducting multiple competitions of skill for a single performance.  The claims of the '988 Patent recite new and unconventional solutions for efficiently and easily conducting multiple contests of skill or chance in a distributed environment simultaneously and in real time.  The claims are necessarily rooted in computer technologies and provide solutions for enabling the entry of an individual in separate competitions, with separate prizes based on their single performance (for example, the participant's score in the contest), where the pool of entrants is different for each competition.  The claims allow

- 14 -

simultaneously allowing a plurality of users to participate in multiple competitions with separate competitors and prizes while utilizing a single performance of the participant, such as the same selections for the competition.  With multiple competition groups, the users are able to have varying success from the same performance in multiple competitions.  The '988 Patent also provides that standings for each of the multiple competitions are transmitted to the devices of the participants in real time, such that competitors may monitor the results of the competitions.

44.    Claim 1 of the '988 Patent recites:

1. A server device for conducting simultaneous multiple contests of skill or chance corresponding to one or more events comprising:

a. a storage mechanism; and

b. an application for interacting with the storage mechanism to allow a plurality of users to simultaneously and in real time compete in the multiple contests of skill or chance, the application further for:

i. receiving each of the plurality of user's input including event selections related to the one or more events and in which of the multiple contests of skill or chance the selections are to be applied, wherein the same event selections are separately and simultaneously applied to each of the selected multiple contests of skill or chance, wherein the event selections enable simultaneously participating with a plurality of the multiple contests of skill or chance;

ii. storing results and standings for each of the multiple contests of skill or chance based on the event selections, wherein the standings are based on the results; and

iii. transmitting the multiple and separate standings to each client device in real time.

45.    The '988 Patent is valid and enforceable.

**D.    DraftKings Sportsbook and Daily Fantasy Sports**

46.    Sports betting is on the rise.  In May 2018, the U.S. Supreme Court struck down as unconstitutional the Professional and Amateur Sports Protection Act of 1992 ("PASPA").  This decision had the effect of lifting federal restrictions on sports betting and allowed states to

determine for themselves the legality of sports betting.  After the decision, many states have legalized some form of online sports betting and many others are likely to do so.

47.     DraftKings' main product offerings to consumers include Daily Fantasy Sports and Sportsbook.  Daily Fantasy Sports was DraftKings' sole product offering until 2018; however, since DraftKings launched its Sportsbook (along with iGaming), states including New Jersey that have approved mobile Sportsbook and iGaming have accounted for a rapidly growing proportion of DraftKings' users, which has contributed to DraftKings revenue growth.

48.     DraftKings launched its first mobile sportsbook in New Jersey.  DraftKings has expanded its geographic footprint and currently offers its mobile and/or retail sportsbooks in seventeen states, including Arizona, Colorado, Connecticut, Illinois, Indiana, Iowa, Louisiana (retail only), Michigan, Mississippi (retail only), New Hampshire, New Jersey, New York (retail only), Pennsylvania, Tennessee, Virginia, West Virginia, and Wyoming.  The DraftKings Daily Fantasy Sports offering is available in most states (currently all states except six: Hawaii, Idaho, Montana, Oregon, Nevada, and Washington State).  DraftKings intends to expand its consumer offerings and launch its product offerings in new geographies.

49.     The     DraftKings     Sportsbook     may     be     accessed     online     at https://sportsbook.draftkings.com and with the DraftKings Sportsbook application for mobile devices.  DraftKings offers a DraftKings Sportsbook "app" for download and installation through the Apple App Store and Google Play Store in certain states.  DraftKings also provides download links for the DraftKings apps on the https://sportsbook.draftkings.com website.

50.     Sports betting is an increasingly popular way to engage consumers in their sports viewing experience and increase their entertainment.  Sports betting involves a user placing a bet by wagering money at some fixed odds.  The matter on which the user bets is often referred to as

- 16 -

a "proposition" or "prop".  If the user wins, DraftKings pays out the bet.  DraftKings generates revenue from the difference between the payouts and the settled handle for bets that DraftKings has taken.

51.     The propositions that DraftKings offers are based on particular sporting events that occur during the year.  For example, NFL football, NBA basketball, and MLB baseball games occur during the calendars for their respective seasons.  During the global COVID-19 pandemic in 2020, major professional sports cancelled or rescheduled significant portions of their seasons which in turn impacted the extent of betting propositions that DraftKings offered on its Sportsbook. The recent resumption of major sports—met with great enthusiasm by the public generally—has resulted in an increased number of betting propositions for various sports on the DraftKings Sportsbook.

52.     DraftKings Sportsbook offers betting propositions that include traditional bets based on end-of-game outcomes, such as who will win a particular game or whether a team will win by more than a certain number of points.  DraftKings Sportsbook also offers "Live In-Game" betting propositions that are made during games and as the action unfolds.  Live In-Game betting is a significant feature of the DraftKings Sportsbook, designed to increase user engagement and enhance the sports betting experience.  DraftKings has referred to certain Live In-Game betting propositions in the DraftKings Sportsbook mobile application as "Flash Bets."  A true and accurate depiction of the operation of the DraftKings Sportsbook mobile app is shown in the following screenshot:



53.     DraftKings offers live in-game betting propositions for various sports, such as MLB

baseball, NBA basketball, tennis, table tennis, and NFL football.  For example, DraftKings offers

"Pitch-by-Pitch" or "Result of Pitch" betting propositions during MLB baseball games.  In these

propositions, DraftKings provides odds on whether a particular pitch in the current inning being

played will be a Strike/Foul, a Ball/Hit by Pitch, or In-Play.  DraftKings also offers "Result of At

Bat" propositions in which DraftKings provides odds for whether a particular batter in the current

inning will record a hit or walk (excluding hit by pitch).  The user selects a particular outcome and

enters an amount of the wager on the selected outcome.  If the user is in a jurisdiction where placing

bets is permitted, the user may place a bet on the proposition.  A true and accurate depiction of an exemplary operation of the DraftKings Sportsbook mobile app is shown in the following screenshots:



54.     For example, DraftKings offers Live In-Game propositions during NBA basketball games.  In these propositions, DraftKings provides odds whether the next field goal will be a 2-pointer or a 3-pointer. The user selects a particular outcome and enters an amount of the wager on the selected outcome.  If the user is in a jurisdiction where placing bets is permitted, the user may

place a bet on the proposition.  A true and accurate depiction of the operation of the DraftKings

Sportsbook mobile app is shown in the following screenshot:



55.     For example, DraftKings offers "Flash Bet" and Live In-Game "Point-by-Point"

propositions during tennis matches.  In these propositions, DraftKings provides odds on which

player in the match being played will win the next point (or the next game).  The user selects a

particular outcome and enters an amount of the wager on the selected outcome.  If the user is in a

jurisdiction where placing bets is permitted, the user may place a bet on the proposition.  A true

and accurate depiction of the operation of the DraftKings Sportsbook mobile app is shown in the following screenshots:



56.     In 2021, DraftKings offered additional "NFL Flash Bets" designed to draw user attention to pivotal moments in games and enhance the users' live betting experiences.  Below are screenshots of these NFL Flash Bets.



DraftKings has stated that it intends to roll out similar offerings to other sports (e.g., College Football, NBA and MLB) in the coming quarters.

57.      As the action unfolds relating to a particular live in-game betting proposition, the DraftKings Sportsbook website and app provide users with updated odds for the betting propositions. DraftKings also presents the odds and betting propositions synchronized to virtual representations of the sporting event, such as a depiction of a baseball diamond, basketball court or tennis court that depict the action. The DraftKings Sportsbook also prevents betting propositions when the user is no longer permitted to make a selection on a particular wager. For example, DraftKings does not allow a user to place a wager on an outcome where the outcome is

already known—otherwise users could easily cheat by betting after they know the result.  When a user is no longer permitted to wager on a particular outcome, the displayed choices for the particular wager are grayed out (or removed from the user interface) and the user is prevented from submitting a selection.  DraftKings sends signals to lock out bets at an appropriate time to level the playing field, increase user engagement, and prevent participants from obtaining information that could give them a material advantage in their betting on the proposition, including for example locking out bets at an appropriate time based on an amount of delay that users may experience depending on the manner in which they receive broadcast content over various transmission methods.

58.     DraftKings' first consumer offering involved Daily Fantasy Sports.  DraftKings offers Daily Fantasy Sports online at https://www.draftkings.com and on the DraftKings Daily Fantasy Sports application for mobile devices.  DraftKings offers a DraftKings Daily Fantasy Sports "app" for download and installation through the Apple App Store and Google Play Store. DraftKings provides download links for these apps at https://www.draftkings.com/mobileapps.

59.     DraftKings provides Daily Fantasy Sports contests users may enter for various sports (including, for example, NFL football, NBA basketball, and MLB baseball, among others), scores the contests, and distributes prizes.  Users can draft a new lineup whenever they want, play in a public contest and against friends in a private league, quickly enter a contest any time before the lineup lock, and win cash prizes weekly that are paid out after the contest ends.  A true and accurate depiction of the DraftKings mobile application (in the example, on an Android device) is shown in the following screenshot:



60.     To increase user participation, and corresponding Daily Fantasy Sports revenue, DraftKings recommends contests for users to join and provides functionality for users to enter their lineups quickly in multiple contests.  For example, DraftKings recommends contests and instructs users to "use your lineup to quickly join these contests."  DraftKings also provides a "Bulk Enter" feature that allows for the entry of the selected lineup in multiple, simultaneous contests.  A true and accurate depiction of the operation of the DraftKings mobile application (in the example, on an Android device) is shown in the following screenshots:

- 24 -



61.     A true and accurate depiction of the operation of the home page of the DraftKings

Daily   Fantasy   website   is   shown   in   the   following   screenshot   from

www.draftkings.com/lobby#/featured:



62.     Sports betting and Daily Fantasy Sports are permitted in New Jersey but not in every state.  In order to ensure compliance with different state laws and provide users with correct permission information, the DraftKings Sportsbook and Daily Fantasy Sports applications and website are configured to monitor the location of the device being used.  If the device is not in a permitted jurisdiction, DraftKings prevents the user from placing bets on the DraftKings app or website and the user is informed that it appears the user is located in a state that betting on DraftKings is not available.

### E.     Pre-Suit Communications

63.     At least as early as May 2016, WinView issued publicly available statements and press releases, including on WinView's website, that refer to the company's patents and state that, among other things, its "portfolio of [] foundational patents . . . covers the synchronization of the second-screen with TV broadcasts and commercials and the optimum methods of monetizing sports-based games of skill, among other types of programming content."

64.     DraftKings was familiar with, and had knowledge of, WinView and its patents before the original complaint in this case was filed.  For example, in January 2018, Tom Rogers, the executive chairman of WinView communicated with Jason Robins, chief executive officer and co-founder of DraftKings, about a potential relationship between WinView and DraftKings. Mr. Rogers thanked Mr. Robins for the opportunity to reconnect and expressed a desire to bring him up to speed on the company's progress and discuss possible opportunities for WinView and DraftKings to work together.  Mr. Rogers suggested an in person meeting in New York or Boston.

65.     In early 2019, WinView and DraftKings had additional communications.  At least as early as January 2019, WinView and DraftKings engaged in discussions regarding WinView's foundational intellectual property for playing along with live sports, including games of skill and sports gambling in the United States.  DraftKings investigated WinView and its business as part of these discussions, including being provided with access, and accessing, detailed information regarding WinView.  During these discussions, DraftKings specifically requested information regarding WinView's patents.  In response to DraftKings' request, WinView provided DraftKings with materials identifying the '243 Patent, the '730 Patent, U.S. Patent Application No. 16/216,885 (which later issued as the '543 Patent), and U.S. Patent Application No. 16/221,307 (which later issued as the '988 Patent).

66.     In late 2020, WinView again pursued discussions with DraftKings regarding its intellectual property and a relationship between the companies.  DraftKings declined to participate in such discussions.  As a result, DraftKings elected to continue its infringement of the Asserted Patents without permission from WinView.

## FIRST CLAIM FOR RELIEF

### (Infringement of U.S. Patent No. 9,878,243)

67.     WinView repeats, realleges, and incorporates herein by reference the allegations of Paragraphs 1 through 66 of its Complaint.

68.     WinView is informed and believes, and on that basis alleges, that DraftKings has infringed and is currently infringing one or more claims of the '243 Patent, in violation of 35 U.S.C. § 271, *et seq*.

69.     DraftKings infringes literally and/or under the doctrine of equivalents, in violation of 35 U.S.C. § 271(a), by, among other things, making, using, offering to sell, and/or selling within this District and elsewhere in the United States, without authority or license, DraftKings products and services falling within the scope of one or more claims of the '243 Patent, including but not limited to claim 1.

70.     For example, DraftKings provides the DraftKings Sportsbook website and the associated mobile application. The DraftKings Sportsbook may be accessed online at https://sportsbook.draftkings.com and by using the DraftKings Sportsbook app on mobile devices such as a smartphone or tablet.  WinView is informed and believes, and on that basis alleges, that DraftKings utilizes one more servers, with their associated memory and processors, to store, host and run the games of skill or chance or other entertainment that comprise the DraftKings Sportsbook.

71.     The DraftKings Sportsbook website and mobile applications equalize effects of latency differences in a game of skill or chance or other entertainment.

72.     The DraftKings Sportsbook website and mobile applications provide users with the opportunity to play games of skill or chance or enjoy other entertainment.  The Sportsbook

provides sports betting propositions and related odds or lines, scores and other content relating to sporting events.  DraftKings refers to the Sportsbook as including "games" offered by DraftKings that customers can play. https://sportsbook.DraftKings.com/legal/nj-terms-of-use (last accessed July 5, 2021) ("Users will be able to visit the Website and view the games (e.g., sportsbook and casino) offered by DraftKings and available to play and place a wager (the 'Game' or collectively, the 'Games').").

73.     The DraftKings Sportsbook website and mobile applications receive an online broadcast of content, including among other things, available sports, betting propositions, game scores, the status of plays, and statistics.  For certain live sporting events, the DraftKings Sportsbook and mobile application provide a sportscast graphical display of the sporting event. For example, for a tennis match, the DraftKings Sportsbook website and/or mobile application may display a representation of tennis court and a representation of a ball moving back and forth during the action.  The screenshots below depict the operation of the DraftKings Sportsbook website and mobile application with regard to a tennis match and a point-by-point betting proposition:





74.     Similarly, for a baseball game, the DraftKings Sportsbook website and/or mobile application receives an online broadcast including a graphical representation of a baseball diamond, batter, the pitch count, and scoreboard.  The screenshots below depict the operation of the DraftKings Sportsbook mobile application with regard to a baseball game and pitch-by-pitch betting proposition:



75.     WinView is informed and believes, and on that basis alleges, that an online broadcast of content is received when producing betting propositions for the DraftKings Sportsbook on the website and DraftKings Sportsbook mobile application.  For example, WinView is informed and believes that a broadcast of content is received for the sporting events identified on the website and in the mobile application and that this broadcast is received online.  For example, WinView is informed and believes, and on that basis alleges, that in producing bets for the Sportsbook, data feeds for the underlying sporting events are received online, such as scores or the resolution of pitches or at bats in a baseball game.

76.     The games of skill or chance and other entertainment on the DraftKings Sportsbook website and mobile application, such as currently available betting propositions, are synchronized with the online broadcast of content.  For example, the currently available betting propositions are synchronized with the sporting event content such that users will not have a material betting advantage.

77.     For example, the DraftKings Sportsbook application synchronizes the betting on the sportsbook app on the user's device with the online broadcast of content.  DraftKings offers "Live In-Game" betting propositions, including "Live Props" and "Flash Bets" that can be made while a sporting event is underway.  In other words, the DraftKings Sportsbook allows users to make wagers while the live sporting event is being played.  DraftKings updates the odds and propositions as the action unfolds and in accordance with what happens in the live sporting event. DraftKings also removes betting propositions that have been resolved and adds new betting propositions as the sporting event progresses. As one example, for a baseball game in the third inning, the DraftKings Sportsbook website and mobile application may display a betting proposition to allow wagers on the "Result of At Bat" for the second batter in that inning.  When that at-bat has resolved, DraftKings will remove the betting proposition for that batter and offer additional betting propositions for subsequent batters in the inning.

78.     The DraftKings Sportsbook website and mobile applications present the online broadcast of content and synchronized game data.  Users accessing the same page of the DraftKings Sportsbook website or same portion of the mobile application are presented with the same content, including among other things available sports, betting propositions, game scores and statistics.  DraftKings updates the odds and betting propositions in accordance with how the live sporting event is being played out in the online broadcast of content.  DraftKings presents the

online broadcast of content depicting what is happening in the sporting event with the synchronized game data constituting, for example, updated odds and propositions in the Sportsbook application.  The screenshots above for the Live Props and Flash Bets for tennis matches and baseball games are examples of the DraftKings Sportsbook presenting an online broadcast of content and synchronized game data.

79.     WinView is informed and believes, and on that basis alleges, that DraftKings is currently infringing one or more claims of the '243 Patent, in violation of 35 U.S.C. § 271, including at least by actively inducing infringement of the '243 Patent under § 271(b) with knowledge of the '243 Patent or with willful blindness that it is inducing infringement, by, among other activities, knowingly, actively and intentionally, aiding and abetting, assisting, encouraging, instructing and/or guiding others to directly infringe one or more claims of the '243 Patent, including customers and end users of the DraftKings Sportsbook, and others who may perform services on behalf of DraftKings in providing the Sportsbook to DraftKings customers.  For example, DraftKings publicly provides the DraftKings Sportsbook application for download on mobile devices, and instruct users on uses of DraftKing's infringing technology.  A relevant webpage may be found at https://sportsbook.DraftKings.com/sportsbook-android-app. DraftKings also induces acts of infringement through its advertising and promotion of the infringing functionality. A relevant webpage may be found at https://www.prnewswire.com/news-releases/draftkings-launches-flash-bet-for-more-instantaneous-live-wagering-experience-300878122.html.

80.     WinView is informed and believes, and on that basis alleges, that DraftKings also has contributed to infringement of one or more claims of the '243 Patent, including but not limited to claim 1, in violation of 35 U.S.C. § 271(c), at least as of the filing of this Complaint, with

knowledge of the '243 Patent and with knowledge or willful blindness by selling and offering to sell within the United States the DraftKings Sportsbook website and mobile application, without authority, which constitute materials and apparatuses for practicing the claimed invention of one or more claims of the '243 Patent, such materials and apparatuses constituting material parts of the inventions of the '243 Patent and not staple articles or commodities of commerce suitable for substantial noninfringing uses. WinView is informed and believes, and on that basis alleges, that DraftKings has knowledge that the DraftKings Sportsbook website and Sportsbook mobile application constitutes material parts of the inventions of the '243 Patent, are not staple articles or commodities of commerce suitable for substantial noninfringing uses, and are used in an infringing manner as explained above.

81.     WinView is informed and believes, and on that basis alleges, that DraftKings became aware of the '243 Patent and that its activities concerning the DraftKings Sportsbook infringed the '243 Patent by January 2019. At the very latest, DraftKings NV has known of the '243 Patent and that its activities concerning the DraftKings Sportsbook infringed the '243 Patent since at least July 7, 2021, when WinView served DraftKings NV with the original complaint. At the very latest, DraftKings DE and Crown Gaming have known of the '243 Patent and that their activities concerning the DraftKings Sportsbook infringed the '243 Patent since at least August 8, 2021, when DraftKings made public SEC filings describing this litigation and the patents asserted.

82.     As a result of DraftKings' infringement of the '243 Patent, WinView has been damaged. WinView is entitled to recover from DraftKings damages sustained as a result of DraftKings' wrongful acts sufficient to compensate WinView for the infringement in an amount subject to proof at trial, and in no event less than a reasonable royalty.

83.     To the extent 35 U.S.C. § 287 is determined to be applicable, on information and belief its requirements have been satisfied with respect to the '243 Patent.

84.     WinView is informed and believes, and on this basis alleges, that in light of DraftKings' knowledge of WinView and the '243 Patent, DraftKings has deliberately infringed and continues to deliberately infringe in a wanton, malicious, and egregious manner, with reckless disregard for WinView's patent rights.  DraftKings' infringing actions have been and continue to be consciously wrongful.

85.     WinView is informed and believes, and on this basis alleges, that the Court should award increased damages under 35 U.S.C. § 284 for willful and deliberate infringement, and find this to be an exceptional case which warrants an award of attorney's fees to WinView pursuant to 35 U.S.C. § 285.

86.     WinView has suffered and continues to suffer irreparable injury as a direct and proximate result of DraftKings' infringement for which there is no adequate remedy at law.  Unless DraftKings is enjoined, WinView will continue to suffer such irreparable injury.

## SECOND CLAIM FOR RELIEF

### (Infringement of U.S. Patent No. 9,993,730)

87.     WinView repeats, realleges, and incorporates herein by reference the allegations of Paragraphs 1 through 66 of its Complaint.

88.     WinView is informed and believes, and on that basis alleges, that DraftKings has infringed and is currently infringing one or more claims of the '730 Patent, in violation of 35 U.S.C. § 271, *et seq*.

89.     DraftKings infringes literally and/or under the doctrine of equivalents, in violation of 35 U.S.C. § 271(a), by, among other things, making, using, offering to sell, and/or selling within

this District and elsewhere in the United States, without authority or license, DraftKings products and services falling within the scope of one or more claims of the '730 Patent, including but not limited to claims 1, 7 and 8.

90.     For example, DraftKings provides the DraftKings Sportsbook website and the associated mobile application. The DraftKings Sportsbook may be accessed online at https://sportsbook.draftkings.com and by using the DraftKings Sportsbook app on mobile devices such as a smartphone or tablet.  WinView is informed and believes, and on that basis alleges, that DraftKings utilizes one more servers, with their associated memory and processors, to store, host and run the games of skill or chance that comprise the DraftKings Sportsbook.

91.     DraftKings refers to the Sportsbook as including "games" offered by DraftKings. https://sportsbook.DraftKings.com/legal/nj-terms-of-use (last accessed June 25, 2021) ("Users will be able to visit the Website and view the games (e.g., sportsbook and casino) offered by DraftKings and available to play and place a wager (the 'Game' or collectively, the 'Games').")

92.     The DraftKings Sportsbook game server stores an application configured to communicate with a plurality of Internet-connected devices, such as mobile phones, tablets, and computers.  DraftKings reported in Q4 2020 that it had 1.5 million unique monthly paying customers.  At least many thousands of devices are and can be in communication with the DraftKings Sportsbook game server at a given time.

93.     WinView is informed and believes, and on that basis alleges, that a plurality of Internet-connected devices in communication with the DraftKings Sportsbook are grouped into a cohort.  The DraftKings Sportsbook game server is capable of providing different information to different groups of users at the same time.  On information and belief, DraftKings provides different and selective information to groups of users grouped into a cohort depending on the

content the user device is accessing at a given time.   For example, one group of users may view odds and betting propositions for a particular baseball game being played on a given day between the New York Yankees and the Boston Red Sox, whereas at the same time another group of users may view information about a match in a professional tennis tournament, or the various other content available on the Sportsbook.   On information and belief, the Internet-connected devices accessing the same particular content (e.g., a particular sporting event) at a given time are grouped into a cohort to receive the same live content for the game being bet on (e.g., real-time game information, available bets and updates thereto, and applicable odds and updates thereto).

94.     The DraftKings Sportsbook application stored in memory on a game server sends a lockout signal at an appropriate time based on an amount of delay to prevent users from submitting a response to a game of skill or chance or other entertainment.  For example, DraftKings offers "Live In-Game" propositions, also referred to as "Live Props" and "Flash Bets."  WinView is informed and believes, and on that basis alleges, that based on broadcast delay that users are experiencing in receipt of content from various sources, such as cable or satellite television, DraftKings sends a lockout signal at an appropriate time to prevent users from submitting a response to the live in-game betting proposition.   For example, for "flash bets" offered in connection with tennis matches, DraftKings informs the group of users viewing this betting proposition that a particular point is "About To Start" or that it is "In Play." DraftKings also informs the group viewing this betting proposition that "Next Bet Coming Soon."  WinView is informed and believes, and on that basis alleges, that these bets are locked out at an appropriate time based on an amount of broadcast delay, for example.  For other in-game propositions, such as for MLB "pitch by pitch" or "result of at bat," as the sporting event progresses, the odds for a particular betting proposition will be grayed out, indicating that users are prevented from

submitting a response on that proposition.  On information and belief, this lockout signal is sent at a time based on, for example, an amount of broadcast delay, so as to permit users watching MLB games on television, online, or through other means with delays in the broadcast transmission path to enter bets corresponding to what they may be watching. The screenshots below are a true and accurate depiction of the operation of the DraftKings Sportsbook app with regard to a point-by-point "Flash Bet" for a tennis match.



95.     The DraftKings game server includes a processor for processing the DraftKings Sportsbook website and the DraftKings Sportsbook mobile app for conducting the games of skill or chance.

96.     WinView is informed and believes, and on that basis alleges, that DraftKings is currently infringing one or more claims of the '730 Patent, in violation of 35 U.S.C. § 271, including at least by actively inducing infringement of the '730 Patent under § 271(b) with knowledge of the '730 Patent or with willful blindness that it is inducing infringement, by, among other activities, knowingly, actively and intentionally, aiding and abetting, assisting, encouraging, instructing and/or guiding others to directly infringe one or more claims of the '730 Patent, including customers and end users of the DraftKings Sportsbook, and others who may perform services on behalf of DraftKings in providing the Sportsbook to DraftKings customers.   For example, DraftKings publicly provides the DraftKings Sportsbook application for download on mobile devices, and instructs users on uses of DraftKings' infringing technology.   A relevant webpage    may    be    found    at    https://sportsbook.DraftKings.com/sportsbook-android-app. DraftKings also induces acts of infringement through its advertising and promotion of the infringing functionality. A relevant webpage may be found at https://www.prnewswire.com/news-releases/draftkings-launches-flash-bet-for-more-instantaneous-live-wagering-experience-300878122.html.

97.     WinView is informed and believes, and on that basis alleges, that DraftKings also has contributed to infringement of one or more claims of the '730 Patent, including but not limited to claims 1, 7, and 8, in violation of 35 U.S.C. § 271(c), at least as of the filing of this Complaint, with knowledge of the '730 Patent and with knowledge or willful blindness by selling and offering to sell within the United States the DraftKings Sportsbook website and mobile application, without

authority, which constitute materials and apparatuses for practicing the claimed invention of one or more claims of the '730 Patent, such materials and apparatuses constituting material parts of the inventions of the '730 Patent and not staple articles or commodities of commerce suitable for substantial noninfringing uses. WinView is informed and believes, and on that basis alleges, that DraftKings has knowledge that the DraftKings Sportsbook website and Sportsbook mobile application constitute material parts of the inventions of the '730 Patent, are not staple articles or commodities of commerce suitable for substantial noninfringing use, and are used in an infringing manner as explained above.

98.      WinView is informed and believes, and on that basis alleges, that DraftKings became aware of the '730 Patent and that its activities concerning the DraftKings Sportsbook infringed the '730 Patent by January 2019. At the very latest, DraftKings has known of the '730 Patent and that its activities concerning the DraftKings Sportsbook infringed the '730 Patent since at least July 28, 2021, when WinView served DraftKings NV with the first amended complaint. At the very latest, DraftKings DE and Crown Gaming have known of the '730 Patent and that their activities concerning the DraftKings Sportsbook infringed the '730 Patent since at least August 8, 2021, when DraftKings made public SEC filings describing this litigation and the patents asserted.

99.      As a result of DraftKings' infringement of the '730 Patent, WinView has been damaged.  WinView is entitled to recover from DraftKings damages sustained as a result of DraftKings' wrongful acts sufficient to compensate WinView for the infringement in an amount subject to proof at trial, and in no event less than a reasonable royalty.

100.     To the extent 35 U.S.C. § 287 is determined to be applicable, on information and belief its requirements have been satisfied with respect to the '730 Patent.

101.    WinView is informed and believes, and on this basis alleges, that in light of DraftKings' knowledge of WinView and the '730 Patent, DraftKings has deliberately infringed and continues to deliberately infringe in a wanton, malicious, and egregious manner, with reckless disregard for WinView's patent rights.  DraftKings' infringing actions have been and continue to be consciously wrongful.

102.    WinView is informed and believes, and on this basis alleges, that the Court should award increased damages under 35 U.S.C. § 284 for willful and deliberate infringement, and find this to be an exceptional case which warrants an award of attorney's fees to WinView pursuant to 35 U.S.C. § 285.

103.    WinView has suffered and continues to suffer irreparable injury as a direct and proximate result of DraftKings' infringement for which there is no adequate remedy at law.  Unless DraftKings is enjoined, WinView will continue to suffer such irreparable injury.

### THIRD CLAIM FOR RELIEF

**(Infringement of U.S. Patent No. 10,721,543)**

104.    WinView repeats, realleges, and incorporates herein by reference the allegations of Paragraphs 1 through 66 of its Complaint.

105.    WinView is informed and believes, and on that basis alleges, that DraftKings has infringed and is currently infringing one or more claims of the '543 Patent, in violation of 35 U.S.C. § 271, *et seq*.

106.    DraftKings infringes literally and/or under the doctrine of equivalents, in violation of 35 U.S.C. § 271(a), by, among other things, making, using, offering to sell, and/or selling within this District and elsewhere in the United States, without authority or license, DraftKings products

and services falling within the scope of one or more claims of the '543 Patent, including but not limited to claims 1 and 9.

107.   For example, DraftKings hosts and runs the DraftKings Sportsbook website and the associated mobile application. The DraftKings Sportsbook may be accessed online at https://sportsbook.draftkings.com and using the DraftKings Sportsbook app on mobile devices such as smartphones or tablets.  DraftKings also hosts and runs the DraftKings Daily Fantasy website and associated mobile application. DraftKings Daily Fantasy may be accessed online at https://www.draftkings.com/lobby and using the DraftKings Daily Fantasy app on mobile devices such as smartphones or tablets.  WinView is informed and believes, and on that basis alleges, that DraftKings utilizes one more servers, with their associated memory and processors, to store, host and run the games of skill or chance that comprise the DraftKings Sportsbook and DraftKings Daily Fantasy.  DraftKings Sportsbook and DraftKings Daily Fantasy implement a consumer service on a mobile web-connected computing device claimed in one or more claims of the '543 patent, literally or under the doctrine of equivalents, including claims 1 and 9.

108.   The DraftKings Sportsbook and DraftKings Daily Fantasy are consumer services. DraftKings provides its Sportsbook and Daily Fantasy products to consumers in order for those consumers to play the games DraftKings provides and/or participate in Daily Fantasy contests. The Sportsbook and Daily Fantasy are among DraftKings' main product offerings to consumers.

109.   In order to access and use the DraftKings Sportsbook and Daily Fantasy products, consumers are required to access the DraftKings website online or download and install the DraftKings Sportsbook and DraftKings Daily Fantasy applications.  As described in the '543 Patent specification:

> The present invention utilizes a software application, referred to as
> an "Activity Client." The "Activity Client" is retained in a user's

computing device's memory. A variety of methodologies are implemented for downloading the "Activity Client" into memory of the cell phone or other computing device utilized…Upon selecting the company's service from this menu [such as the app store], a data connection is made to either the cellular service provider or the company's server, and the "Activity Client" is downloaded to the user's cell phone or other computing device…In some embodiments, the downloaded "Activity Client" resides in the cell phone's compact flash memory.

Ex. 3 at 6:26-54.  DraftKings requires users to register an account with DraftKings before being able to play games and place bets with the DraftKings Sportsbook.  The screenshot below depicts the operation of the DraftKings Sportsbook app on a mobile device.



110.    Further, DraftKings requires users to register an account with DraftKings before being able to use its Daily Fantasy offering.  The screenshot below depicts the operation of the DraftKings Daily Fantasy app on a mobile device.



111.    Further, DraftKings requires users to agree to terms and conditions in order to use the Sportsbook and Daily Fantasy offerings.

112.    The DraftKings Sportsbook and Daily Fantasy systems identify the current geographic location of the user's mobile device or computer.  Due to state law, DraftKings must ensure that a user is physically located where online sports betting or Daily Fantasy is legal.  The

DraftKings Sportsbook website and mobile application allows users to place bets only if they are in certain states.  *See*   https://sportsbook.draftkings.com/help/sports-betting/where-is-sports-betting-legal.  Similarly, the DraftKings Daily Fantasy website and mobile application will allow users to participate in contests for prizes only in jurisdictions where Daily Fantasy is permitted. *See* https://www.draftkings.com/where-is-draftkings-legal.

113.    In order to ensure compliance with different state laws, DraftKings monitors the location of the user and presents different information to the user as the location of the user changes.  For example, if the user's mobile web-connected device is in a location where mobile sports betting is not permitted, the DraftKings Sportsbook app will not allow the user to bet and will present a notice to the user that the requested service is not available.  The screenshot below is a true and accurate depiction of the operation of the DraftKings Sportsbook application.



114.    If the geographic location of the user's mobile web-connected device is within a state where sports betting is legal (and the user has sufficient funds on deposit), the Sportsbook application will place the requested bets.  If the user's mobile web-connected device leaves an allowed jurisdiction during their session on the DraftKings Sportsbook, the user will no longer be eligible to continue playing on the DraftKings Sportsbook.  A DraftKings FAQ states:

5) What happens if I leave allowed jurisdiction in the middle of a game session?

If you leave allowed jurisdiction during your session, you will no longer be eligible to continue playing and your session will be terminated. You will be permitted to play again once you return to a permitted jurisdiction and we are able to verify your location.

https://sportsbook.draftkings.com/help/faq (last accessed July 5, 2021).  Likewise, if a user's mobile web-connected device is in, or changes location to, a state where fantasy contests are not permitted, the DraftKings Daily Fantasy app will present information that the user cannot participate.

115.    WinView is informed and believes, and on that basis alleges, that the DraftKings Sportsbook and DraftKings Daily Fantasy offerings include selecting an option from the activity client from a list of available options.  For example, DraftKings establishes the manner and timing of users' performance by presenting options to users in the activity client, whereby the user is required to select an option, for example, a sporting event, bet, or lineup, to proceed with using the DraftKings Sportsbook and DraftKings Daily Fantasy. If users do not follow these precise actions, DraftKings' Sportsbook and Daily Fantasy services are not available.

116.    WinView is informed and believes, and on that basis alleges, that the DraftKings Sportsbook and DraftKings Daily Fantasy offerings include downloading a set of service-specific information related to a selected option from a server to the mobile web-connected computing device.  For example, when an option is selected, such as which contest is to be entered in DraftKings Daily Fantasy, a set of service-specific information is downloaded to the mobile web-connected computing device such as the lineup options for that contest.  As further example, when an option is selected, such as which sporting event the user wishes to view the available bets for in the DraftKings Sportsbook, a set of service-specific information is downloaded to the mobile web-connected computing device such as the available bets and betting odds for that sporting event.  If users do not follow these precise actions, DraftKings' Sportsbook and Daily Fantasy services are not available. The screenshot below is a true and accurate depiction of the operation of the DraftKings Daily Fantasy application, showing examples of the set of service specific

- 48 -

information (i.e., the particular lineup options, including K. Murray and A. Kamara) that is downloaded when the user selects an option such as, for example, the "NFL $3.5M Fantasy Football Millionaire":



117.    WinView is informed and believes, and on that basis alleges, that the DraftKings Sportsbook and DraftKings Daily Fantasy offerings include executing an application related to the

selected option within the activity client on the mobile web-connected computing device.  For example, where the selected option is a sporting event on which to place a wager, the DraftKings Sportsbook includes executing an application within the activity client to accept a wager placed by the user.  As a further example, where the selected option is the selected contest to enter, the DraftKings Daily Fantasy offering includes executing an application within the activity client to accept a buy-in and lineup by the user. The screenshot below is a true and accurate depiction of the operation of the DraftKings Daily Fantasy application:



118.   DraftKings conditions a user's receipt of any potential benefit of the DraftKings Sportsbook and/or Daily Fantasy offerings on the user selecting an option and paying the requisite wager or entry fee.  For example, in order to participate in any contests or place bets, DraftKings Sportsbook requires users to provide DraftKings with their selections of which proposition(s) they wish to bet on, and DraftKings Daily Fantasy requires users to provide DraftKings with their

selected contests and lineup.  DraftKings controls the manner and timing of these user selections and instructs users of the DraftKings Sportsbook and/or DraftKings Daily Fantasy offering how the selections are to be made in order to participate in contests and receive a potential prize payout from DraftKings.

119.     DraftKings also benefits by providing the Sportsbook and Daily Fantasy products to attract users and increase its revenue. Additionally, DraftKings benefits from the enhanced state-by-state legal compliance and efficiency in user verification, which in turn reduces DraftKings' legal liability and increases its revenue.

120.     WinView is informed and believes, and on that basis alleges, that DraftKings is currently infringing one or more claims of the '543 Patent, in violation of 35 U.S.C. § 271, including at least by actively inducing infringement of the '543 Patent under § 271(b) with knowledge of the '543 Patent or with willful blindness that it is inducing infringement, by, among other activities, knowingly, actively and intentionally, aiding and abetting, assisting, encouraging, instructing and/or guiding others to directly infringe one or more claims of the '543 Patent, including customers and end users of the DraftKings Sportsbook and Daily Fantasy applications, and others who may perform services on behalf of DraftKings in providing the DraftKings Sportsbook and Daily Fantasy offering to DraftKings customers.  For example, DraftKings publicly provides the DraftKings Sportsbook and DraftKings Daily Fantasy application for download on mobile devices, and instruct users on uses of DraftKings' infringing technology.

121.     WinView is informed and believes, and on that basis alleges, that DraftKings has contributed to infringement of one or more claims of the '543 Patent in violation of 35 U.S.C. § 271(c), at least as of the filing of this Complaint, with knowledge of the '543 Patent and with knowledge or willful blindness by selling and offering to sell within the United States the

DraftKings Sportsbook and Daily Fantasy applications, without authority, which constitute materials and apparatuses for practicing the claimed invention of one or more claims of the '543 Patent, such materials and apparatuses constituting material parts of the inventions of the '543 Patent and not staple articles or commodities of commerce suitable for substantial noninfringing uses. WinView is informed and believes, and on that basis alleges, that DraftKings has knowledge that the DraftKings Sportsbook website and Sportsbook mobile application, as well as the DraftKings Daily Fantasy website and mobile applications, constitute material parts of the inventions of the '543 Patent, are not staple articles or commodities of commerce suitable for substantial noninfringing use, and are used in an infringing manner as explained above.

122.     U.S. Patent Application No. 16/216,885 was issued as the '543 Patent on July 21, 2020. WinView is informed and believes, and on that basis alleges, that DraftKings became aware of the '543 Patent and that its activities concerning the DraftKings Sportsbook and DraftKings Daily Fantasy offerings infringed the '543 Patent no later than upon its issuance on July 21, 2020. At the very latest, DraftKings has known of the '543 Patent and that its activities concerning the DraftKings Sportsbook and DraftKings Daily Fantasy offerings infringed the '543 Patent since at least July 7, 2021, when WinView served DraftKings NV with the original Complaint.   At the very latest, DraftKings DE and Crown Gaming have known of the '543 Patent and that their activities concerning the DraftKings Sportsbook and DraftKings Daily Fantasy offerings infringed the '543 Patent since at least August 8, 2021, when DraftKings made public SEC filings describing this litigation and the patents asserted.

123.     As a result of DraftKings' infringement of the '543 Patent, WinView has been damaged.  WinView is entitled to recover from DraftKings damages sustained as a result of

DraftKings' wrongful acts sufficient to compensate WinView for the infringement in an amount subject to proof at trial, and in no event less than a reasonable royalty.

124. To the extent 35 U.S.C. § 287 is determined to be applicable, on information and belief its requirements have been satisfied with respect to the '543 Patent.

125. WinView is informed and believes, and on this basis alleges, that in light of DraftKings' knowledge of WinView and the '543 Patent, DraftKings has deliberately infringed and continues to deliberately infringe in a wanton, malicious, and egregious manner, with reckless disregard for WinView's patent rights. DraftKings' infringing actions have been and continue to be consciously wrongful.

126. WinView is informed and believes, and on this basis alleges, that the Court should award increased damages under 35 U.S.C. § 284 for willful and deliberate infringement, and find this to be an exceptional case which warrants an award of attorney's fees to WinView pursuant to 35 U.S.C. § 285.

127. WinView has suffered and continues to suffer irreparable injury as a direct and proximate result of DraftKings' infringement for which there is no adequate remedy at law. Unless DraftKings is enjoined, WinView will continue to suffer such irreparable injury.

## FOURTH CLAIM FOR RELIEF

### (Infringement of U.S. Patent No. 10,806,988)

128. WinView repeats, realleges, and incorporates herein by reference the allegations of Paragraphs 1 through 66 of its Complaint.

129. WinView is informed and believes, and on that basis alleges, that DraftKings has infringed and is currently infringing one or more claims of the '988 Patent, in violation of 35 U.S.C. § 271, *et seq*.

130.     DraftKings infringes literally and/or under the doctrine of equivalents, in violation of 35 U.S.C. § 271(a), by, among other things, making, using, offering to sell, and/or selling within this District and elsewhere in the United States, without authority or license, DraftKings products and services falling within the scope of one or more claims of the '988 Patent, including but not limited to claim 1.

131.     For example, DraftKings hosts and runs the DraftKings Daily Fantasy website and the associated mobile application. DraftKings Daily Fantasy may be accessed online at https://www.draftkings.com/lobby and using the DraftKings Daily Fantasy app on mobile devices such as a smartphone or tablet.  WinView is informed and believes, and on that basis alleges, that DraftKings utilizes one more servers, with their associated memory and processors, to store, host, and run the contests of skill or chance that comprise the DraftKings Daily Fantasy offering.

132.     DraftKings refers to its Daily Fantasy offering as including "contests" offered by DraftKings.  The screenshot below is a depiction of an example of the operation of the DraftKings Daily Fantasy website "Lobby" showing a list of available "contests:"



133.    The DraftKings Daily Fantasy server conducts simultaneous multiple contests of skill or chance corresponding to one or more events.  For example, the DraftKings Daily Fantasy contests available on a given day correspond to one or more events, such as the same sporting event or set of sporting events occurring on that day.  Sporting events with respect to which DraftKings Daily Fantasy offers contests may include, for example during the Major League Baseball season, the Major League Baseball games being played that day. These multiple contests are separate competitions and may differ due to available prizes, entry cost, participants, and other factors.  These multiple contests are conducted simultaneously as the Major League Baseball games are played.

134.    In order to receive any benefit from DraftKings Daily Fantasy and participate in the contests of skill or chance, DraftKings Daily Fantasy requires all users to input event selections and which of the multiple contests the user's selections are to be applied.  For example, DraftKings

Daily Fantasy requires users to select a lineup of players to enter into the available contests to be eligible for a particular contest's prize money.

135.   DraftKings Daily Fantasy also offers all users the opportunity to participate in multiple contests and to do so using the same selections (e.g., lineup).  DraftKings Daily Fantasy specifically encourages users to simultaneously participate in multiple contests and prompts users to "bulk-enter" or "multi-enter" multiple contests using a single lineup.  For example, DraftKings Daily Fantasy encourages users to "multi-enter" "recommended contests" with the same lineup which will be separately and simultaneously applied to each of the contests in which the user will participate.  The selected lineup enables simultaneously participating with the multiple contests. The following screenshots display this functionality on the DraftKings Daily Fantasy application and website:





136.    DraftKings Daily Fantasy further stores, tracks and maintains results and standings for each of the multiple contests, where the results and standings for a particular user are based on the user's selections and the performance of those selections in the contest.  Each user will have unique results and standings for each of the multiple contests they have entered based on their selections.

137.    DraftKings transmits the multiple and separate standings for the contests to each particular user's device, such as their internet-connected mobile phone or laptop, in real time as the contests progress as sporting events to which the contests relate, such as Major League Baseball

games, are being played.  As the sporting events on which the selections are carried out, DraftKings

will update the results and standings and transmits the updated standings for each of the contests

in real time.  The following screenshot displays a depiction of this functionality of the DraftKings

Daily Fantasy mobile application:



138.    The DraftKings Daily Fantasy server includes a storage mechanism and an

application which are used to operate the multiple Daily Fantasy contests and carry out the above-

described functionality.

139.    WinView is informed and believes, and on that basis alleges, that DraftKings is currently infringing one or more claims of the '988 Patent, in violation of 35 U.S.C. § 271, including at least by actively inducing infringement of the '988 Patent under § 271(b) with knowledge of the '988 Patent or with willful blindness that it is inducing infringement, by, among other activities, knowingly, actively and intentionally, aiding and abetting, assisting, encouraging, instructing and/or guiding others to directly infringe one or more claims of the '988 Patent, including customers and end users of the DraftKings Daily Fantasy offering, and others who may perform services on behalf of DraftKings in providing the Daily Fantasy offering to DraftKings customers.  For example, DraftKings publicly provides the DraftKings Daily Fantasy application for download on mobile devices, and instruct users on uses of DraftKings' infringing technology. A relevant webpage may be found at https://www.draftkings.com/mobileapps.

140.    WinView is informed and believes, and on that basis alleges, that DraftKings also has contributed to infringement of one or more claims of the '988 Patent, including but not limited to claim 1, in violation of 35 U.S.C. § 271(c), at least as of the filing of this Complaint, with knowledge of the '988 Patent and with knowledge or willful blindness by selling and offering to sell within the United States the DraftKings Daily Fantasy website and mobile application, without authority, which constitute materials and apparatuses for practicing the claimed invention of one or more claims of the '988 Patent, such materials and apparatuses constituting material parts of the inventions of the '988 Patent and not staple articles or commodities of commerce suitable for substantial noninfringing uses.  WinView is informed and believes, and on that basis alleges, that DraftKings has knowledge that the DraftKings Daily Fantasy website and Daily Fantasy mobile application constitute material parts of the inventions of the '988 Patent, are not staple articles or

commodities of commerce suitable for substantial noninfringing use, and are used in an infringing manner as explained above.

141.    U.S. Patent Application No. 16/221,307 was issued as the '988 Patent on October 20, 2020. WinView is informed and believes, and on that basis alleges, that DraftKings became aware of the '988 Patent and that its activities concerning the DraftKings Daily Fantasy offerings infringed the '988 Patent no later than upon its issuance on October 20, 2020. At the very latest, DraftKings has known of the '988 Patent and that its activities concerning the DraftKings Daily Fantasy offerings infringed the '988 Patent since at least July 28, 2021, when WinView served DraftKings NV with the First Amended Complaint.  At the very latest, DraftKings DE and Crown Gaming have known of the '988 Patent and that their activities concerning the DraftKings Daily Fantasy offerings infringed the '988 Patent since at least August 8, 2021, when DraftKings made public SEC filings describing this litigation and the patents asserted.

142.    As a result of DraftKings' infringement of the '988 Patent, WinView has been damaged. WinView is entitled to recover from DraftKings damages sustained as a result of DraftKings' wrongful acts sufficient to compensate WinView for the infringement in an amount subject to proof at trial, and in no event less than a reasonable royalty.

143.    To the extent 35 U.S.C. § 287 is determined to be applicable, on information and belief its requirements have been satisfied with respect to the '988 Patent.

144.    WinView is informed and believes, and on this basis alleges, that in light of DraftKings' knowledge of WinView and the '988 Patent, DraftKings has deliberately infringed and continues to deliberately infringe in a wanton, malicious, and egregious manner, with reckless disregard for WinView's patent rights.  DraftKings' infringing actions have been and continue to be consciously wrongful.

145.     WinView is informed and believes, and on this basis alleges, that the Court should award increased damages under 35 U.S.C. § 284 for willful and deliberate infringement, and find this to be an exceptional case which warrants an award of attorney's fees to WinView pursuant to 35 U.S.C. § 285.

146.     WinView has suffered and continues to suffer irreparable injury as a direct and proximate result of DraftKings' infringement for which there is no adequate remedy at law.  Unless DraftKings is enjoined, WinView will continue to suffer such irreparable injury.

## PRAYER FOR RELIEF

WHEREFORE, WinView prays for judgment against DraftKings as follows:

A.     That DraftKings has infringed, and unless enjoined will continue to infringe, each of the Asserted Patents;

B.     That DraftKings has willfully infringed each of the Asserted Patents;

C.     That DraftKings pay WinView damages adequate to compensate WinView for DraftKings' infringement of each of the Asserted Patents, together with interest and costs under 35 U.S.C. § 284;

D.     That DraftKings be ordered to pay prejudgment and post-judgment interest on the damages assessed;

E.     That DraftKings pay WinView enhanced damages pursuant to 35 U.S.C. § 284;

F.     That DraftKings be ordered to pay supplemental damages to WinView, including interest, with an accounting, as needed;

G.     That DraftKings be enjoined from infringing the Asserted Patents, or if its infringement is not enjoined, that DraftKings be ordered to pay ongoing royalties to WinView for any post-judgment infringement of the Asserted Patents;

H.     That this is an exceptional case under 35 U.S.C. § 285, and that DraftKings pay WinView's attorneys' fees and costs in this action; and

I.     That WinView be awarded such other and further relief, including equitable relief, as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), WinView hereby demands a trial by jury on all issues triable to a jury.

## <u>CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2</u>

Plaintiff, by its undersigned counsel, hereby certifies pursuant to Local Civil Rule 11.2 that

the matters in controversy are not the subject of any other action pending in any court or of any

pending arbitration or administrative proceeding, with the exception of the related case *WinView*

*Inc. v. FanDuel Inc.*, Civil Action No. 21-13807 (ZNQ) (DEA), also pending in this Court, which

involves the same patents-in-suit.

Dated:  November 15, 2021

*/s/ Thomas R. Curtin*
Thomas R. Curtin
Joseph P. LaSala
George C. Jones
MCELROY, DEUTSCH, MULVANEY
 & CARPENTER, LLP
1300 Mount Kemble Avenue
P.O. Box 2075
Morristown, NJ 07962-2075
Tel: (973) 993-8100
Fax: (973) 425-0161
tcurtin@mdmc-law.com
jlasala@mdmc-law.com
gjones@mdmc-law.com

Morgan Chu
Richard M. Birnholz
Keith A. Orso
Jordan Nafekh
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067-4276
Tel: (310) 277-1010
Fax: (310) 203-7199
mchu@irell.com
rbirnholz@irell.com
korso@irell.com
jnafekh@irell.com

*Attorneys for Plaintiff WinView Inc.*

- 64 -